Mr. Justice CLIFEOBD
 

 stated the case and delivered the opinion of the court.
 

 ■ Volunteer forces for the' public service in the war of the Revolution were, in many instances, furnished by the States, and all such, as well as the regular forces, were paid for their services to a large extent in continental money, which so depreciated in a short time as to become almost valueless.
 

 Troops for that service were raised by the State of Virginia, known as the Virginia line on continental establishment, and they also were paid for their services in that currency; and in order to afford relief for the loss which the troops sustained in that way, the legislature of the State, at the November session 1781, passed an act directing the auditor of public accounts to settle and adjust the pay and accounts of the officers and soldiers of that line, so as to make their claims for pay and subsistence equal to specie, such adjustment to cover the period from the first day of January, 1777, to the last day of December, 1781; and the directions to the auditor were that he should issue printed certificates to the respective applicants for the balance found due to them in such adjustment, payable on or before the first day of January, 1785, with interest at the rate of six per centum per annum.
 
 †
 

 Directions were also given to the auditor in the same act that he should in like manner settle and adjust the accounts
 
 *384
 
 • of all officers and soldiers of the said line who have fallen or died in the service during that pei’iod, and the provision was that their representatives should be entitled to such certificates, and all other benefits and advantages therein granted to the officers and soldiers in the line at the date of the act.
 
 *
 

 None of these matters are the subject of controversy, and it is also alleged and admitted that William Rickman, of Charles City, Virginia, was a deputy director general in the Virginia line on continental establishment; that he served three years or more as -such director, and that he thereby became entitled also to Virginia military bounty-lands.
 

 On the seventh of August, 1778, William Rickman made and published his last will and testament, by which he gave and bequeathed to his wife, Elizabeth Rickman, all his estate, both real and personal, in fee simple, and appointed his wife, together with Benjamin Harrison, her father, and her brother, Benjamin Harrison, Jr., the executors of his will so made and published. Three years afterwards the testator died, leaving the said last will and testament unrevoked and in full force, and the same was subsequently duly proved and admitted to record.
 

 Application in behalf of Elizabeth Rickman, as the widow and executrix of her deceased husband, was afterwards made to the auditor of public accounts to settle and adjust the pay and subsistence accounts of the testator as an officer in the-Virginia line on continental establishment, and on the twenty-eighth of February, 1784, the requested adjustment was made. By that adjustment the auditor of public accounts found that there was a balance due to the deceased, or to his legal representatives, of one thousand seven hundred and twenty-two pounds nineteen shillings and two pence, and the record shows that the evidence of the indebtedness of the State to the deceased for that amount was delivered to B. Harrison on the same day the adjustment was made.
 

 
 *385
 
 Prior to that adjustment, to wit, on the twenty-ninth of November, 1783, the House of Delegates of Virginia passed two resolutions which it becomes important to notice.
 

 1. That the petition of Elizabeth Rickman praying that the auditor of public accounts should settle and adjust the pay and accounts of her late husband was reasonable, showing satisfactorily that the adjustment was largely influenced by the legislature.
 

 2. That Elizabeth Rickman, widow of William Rickman, be allowed such a portion of laud as the rank and service of the deceased merit.
 

 Pursuant to the second resolution the governor of the State, Benjamin Harrison, on the twelfth of January, 1784,. executed a certificate that Elizabeth Rickman, widow and executrix of William Rickman, director-general, is entitled to the proportion of land allowed a colonel in the continental line who has served three years, and .on the following day a warrant for six thousand six hundred and sixty-six and two-thirds acres was issued to her, signed by the register of the State land office.
 

 Five years later she intermarried with John Edmondson,, and they afterwards, during the succeeding year, united in executing a.deed of'trust or post-nuptial agreement to her brother, Carter B. Harrison, of all her estate, real and personal, or to which she was entitled under the will of her former husband, for her separate use and advantage, her heirs, executors, and administrators, the husband stipulating therein that she might dispose of the same by her last wilL and testament as she should see fit to do.
 

 On the third of May, 1790, Elizabeth Edmondson made-her last will and testament, which was olographic, and on the first day of ‘January, 1791, she died, leaving her will in full force, and on the twentieth of the same month the will was proved and admitted to record in the county where she resided at her decease.
 

 Absolute title to the lands embraced in the warrant signed by the land register is claimed by the complainants, upohthe ground that the same were devised in fee simple by Elf£&«'
 
 *386
 
 beth Edmondson to her husband, John Edmondson, by her last will and testament, but the respondents deny that her will when properly construed contains any such devise, and insist that the will, if it made any disposition of those lauds, ouly devised to the husband a life estate in the same, and that the fee simple title to the same, inasmuch as the testatrix died without issue, descended to her brothers and sisters, under whom they claim, as alleged in the answer.
 

 Unless the course of descent was broken by the will of the testatrix, it is clear that her brothers and sisters became the ownei’s of the lands embraced in that warrant, as it is conceded that she died without issue.
 

 Afterwards, in the year 1795, the said John Edmondson married again, and the record shows that he had three children by the second wife, one of whom died before the father without issue, leaving John and Elizabeth, the latter having since intermarried with Littleton Waddell, the other complainant and appellant in the case before the court.
 

 Before his decease, John Edmondson, the father of the two appellants, John and Elizabeth, also made a will and devised all his property to his three children, one of whom, as before stated, died during the lifetime of the father. His will bears date on the third of October, 1802, and the pleadings show that he died on the first day of December following, leaving the two children before named as his principal devisees and sole heirs-at-law. They, together with the husband of Elizabeth, claim-the lands iu controversy upon the ground that the same were devised to the father of John and Elizabeth by the will of his first wife.
 

 Defences of various kinds are set up in the answer, but in the view taken of the case it is not necessary to enter into those details, as the court is of the opinion that the decision of the case must turn upon the construction of the will of Elizabeth Edmondson, deceased, it being conceded that she held the title to the lands in controversy under the warrant granted to her for the same by the State.
 

 Proofs were introduced by both parties, but the Circuit Court was of the opinion that the complainants were not
 
 *387
 
 entitled to recover, and entered a decree dismissing the bill of complaint. 'Whereupon the complainants appealed to this court, but the appeal was dismissed, it appearing on the face of the record that the transcript was not filed in this court during the term next succeeding the allowance of the appeal.
 
 *
 

 Since that time a new appeal has been allowed to the complainants and they have removed the cause into this court, seeking to reverse the same decree from which the first appeal was taken. Pending the present appeal a motion to dismiss was filed by the respondents, which was heard at the same time with the merits, but the questions involved in the motion will not be decided, as the court is of the opinion that the decree of the Circuit Court dismissing the bill of complaint for the want of equity is correct.
 

 Motions of the kind are usually determined before proceeding to examine the merits of the controversy, but the court deems it proper to adopt a different course on the present occasion for the following reasons, among others which might be-mentioned: (1.) Because differences qf opinion exist in the court as to the proper disposition to be made of the motion, irrespective of the fact that the case has been twice heard upon the merits. (2.) Because the respondents, when the case was here before, went to final hearing without making any objections to the regulai’ity of the appeal.
 

 Affirmative relief, it is true, could not be granted to the complainants without first disposing of some of the questions involved in the motion, but inasmuch as an affirmance of the deci’ee of the Circuit Coui’t will effect substantially the same result as a dismissal of the appeal, the court is not inclined to decide the pi’eliminai’y questions.
 

 Letters of administration on the estate of Elizabeth Edmondson were gi’anted to Johxx Edmondson, the husband of the deceased, as no executor was named in the will. Sevex-al bequests to the husband were made by the testatrix in
 
 *388
 
 the will which need not be noticed, as they furnish no aid in the solution of the question presented for decision. Those clauses relate to certain articles of personal property which she gave to her husband forever, and to certain slaves which she gave to him “ to dispose of as he may think proper.” "Preceding the clause disposing of the articles of personal property the will contains the following devise: “ I give to my dear husband, John Edmondson, all the land I possess,
 
 during Ms life”
 
 but the will contains no residuary clause of a genera] nature. Enough appears to show that the testatrix owned real estate, as she devised the house and land where they lived, at the death of her husband, to one of her brothers, and to another brother she gave, at the decease of her husband, a certain other tract described in the will as having been purchased by her first husband, but the will does not in terms make any ultimate disposition of the lands devised to her husband during his life except those two parcels, and the complainants do not controvert the proposition that the lands.in question, if they were devised to' the husband under that clause of the will, descended at his decease to the brothers and sisters of the testatrix, as contended by the respondents. They deny, however, that the lands in controversy, or any portion of the same, were devised to him by that clause. On the contrary, they rely upon another clause in thé will as the foundation of their claim, which follows the bequests before mentioned to her husband and certain other bequests of like kind to her brothers and sisters and other relatives, specifying ih each of the several bequests the name of the legatee.
 

 Having devised all the land she possessed to her husband during his life, and made those bequests, the testatrix provides as follows: “ My certificates that are in the hands of my brother Ben, I desire may be given to my .husband to dispose of as he may think proper.” Founded on that clause in the will, the theory of the complainants is that the warrant signed by the land agent for the six thousand six hundred and sixty-six and two-thirds acres of bounty-lands was devise 1 to their father, and that at the decease of the testa
 
 *389
 
 trix he became the owner in fee simple of the lands surveyed and located under that warrant, and that they, as the devisees in his will and his sole heirs-at-law, are the lawful owners of the lands in controversy.
 

 Support to that theory is attempted to be drawn from the fact that the governor, before the warrant was signed, granted a certificate in which he certified that the widow and executrix of the deceased claimant was entitled to the proportion of land allowed to a colonel of the continental line who had served three years, but the decisive answer to any such attempt is that the certificate of the governor was, on the following day, deposited in the proper office as the legal foundation of the land warrant, where it has ever since remained.
 

 Most of the introductory allegations of the bill of complaint are admitted by the respondents. They also admit that Elizabeth Rickman, before her marriage with John Edmondson, obtained the certificates for the balance due her first husband for pay and subsistence as director general in the continental line, and also for the interest due on the same, and that she also obtained the warrant for the lands in controversy, but they utterly deny that the word certificates as used in the clause of the will under which the complainants claim means or intends the warrant in question or the lands described in the pleadings.
 

 Persons having claims to bounty lands were required at that time, by the laws of that State, to exhibit their vouchers to the executive, and if found to be correct and the claim was allowed, it was the duty of the governor to issue .a certificate to that effect to the register of the land office, and the register, upon the filing of that certificate, was required to grant the warrant.
 
 *
 

 More than six years before the testatrix made .her last-will and testament in which she uses the phrase “ my certificates that are in the hands of my brother Ben,” the cer«
 
 *390
 
 tificat'e as to the bounty lands had been surrendered to the register of the land office, and the land warrant in question had been issued in its place, and there is no evidence that the land warrant or the certificate which-preceded it was ever in the hands of any one of the brothers of tlie testatrix.
 

 Undoubtedly the certificate for the balance due for pay and the subsistence accounts arising from the depreciation of the currency in which the original claimant was paid and the certificates for the interest on the same did pass by that clause in the will to the husband of the testatrix, and the proofs are satisfactory that those certificates were in the hands of her brother Benjamin af the date of the will. Those certificates bear date on the twenty-eighth of February, 178-1, and they were immediately delivered to the brother named in the will as having them in his hands, where they remained to the date of the will of the testatrix and to the time of her death.
 

 Certified copies of the certificate signed by the governor as the foundation for the land warrant are exhibited in the record as given by the register of the land office, which Bhows that it could not have been in the hands of her brother at the date of the will, as it had been in the register’s office more than six years before the will was executed. Suppose, however, that it appeared that the land warrant had been in the possession of her brother, from its date to the time when the testatrix died, still it would be difficult, if not impossible, to hold that the .signification of the word certificates, as used in the will, is suffieiently'comprehensive to include that instrument, as the word certificate seems to have an appropriate and direct reference to the instruments of evidence issued to the testatrix for the back pay and subsistence accounts of her former husband, as before explained.
 

 Attempt is made in argument to show that the words certificate and warrant are sometimes used in the statutes of the State as words of equivalent import, but the examples put do not relate to the same subject, and.if they did it would not be difficult to show that the words are there used
 
 *391
 
 rather as conferring an alternative authority than as words of synonymous signification. Be that as it may, still it is evident that the word certificates was used by the testatrix as referring directly to the instruments in the hands of her brother, which were given in the adjustment of her claim for the balance due to fyer former husband to make his pay as director-general equal to what it would have been if he had been paid in specie.
 

 Strong confirmation of that view is derived from the cdurse pursued in the settlement of her estate and the long acquiescence of the complainants in the pretensions of the respondents and those under whom they claim. Evidence, however, of the most satisfactory character ivas introduced by the respondents showing that the land warrant never was in the hands of her brother prior to the date of the will, or at
 
 any
 
 other time, but it is not deemed necessary to enter into those details, as we are all of the opinion that the land warrant, if it passed to the husband by the will, passed under the devise which gave him during his life all the land which the testatrix possessed, that it did not pass to him by the other devise, and that the decree of the Circuit Court dismissing the bill of complaint is correct.
 

 Decree affirmed.
 

 †
 

 10 Hening’s Statutes of Virginia, 462.
 

 *
 

 10 Hening’s Statutes of Virginia, 463.
 

 *
 

 Edmondson
 
 v.
 
 Bloomshire, 7 Wallace, 306.
 

 *
 

 11 Hening’s Statutes of Virginia, 83; Swan’s Land Laws, 118.